GUND v. LOGAN et al.

(Circuit Court of Appeals, Seventh Circuit. January 10, 1911. Rehearing Denied April 11, 1911.)

No. 1,687.

1. CORPORATIONS (§ 95*)—STOCK CERTIFICATES—RECEIPT FOR SUBSCRIPTION.
    New Jersey Corporation Act (P. L. 1896, p. 277) § 19, provides that every stockholder shall have a certificate signed by the president and treasurer, certifying the number of shares owned by him in such corporation. *Held*, that a purchaser of shares in a corporation organized under such act was ordinarily entitled to a valid stock certificate properly so executed, and hence an order to a broker to purchase stock was not ordi-

narily fulfilled by a delivery of a temporary receipt for stock subscrip-tions, certifying that the person named was the owner of the stated num-ber of shares fully paid, and that a certificate therefor would be issued when engraved, and ready for delivery on presentation of the receipt.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 436; Dec. Dig. § 95.*]

2. CORPORATIONS (§ 121*)—PURCHASE OF STOCK—CONTRACT—PERFORMANCE BY BROKER—EVIDENCE.

Evidence *held* to require a finding that brokers' contract to purchase stock in a corporation, the certificates of which had not then been en-graved and were not ready for delivery, was performed and expected by the customer to be fully performed by the delivery of temporary receipts for stock subscription certifying to the ownership of the shares and pro-viding that the certificates would be delivered when engraved and ready for delivery on presentation of the receipt.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 121.*]

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by John Gund, Jr., against Theron Logan and others, doing business as Logan & Bryan. Judgment for defendants, and plaintiff brings error. Affirmed.

The plaintiff in error, as plaintiff below, sued the defendants (Logan & Bryan, Chicago brokers), to recover the purchase money paid for shares of stock in Empire Consolidated Quicksilver Mining Company (a New Jersey cor-poration), alleged to be undelivered, under plaintiff's purchase thereof and demand for delivery. On trial of the issues to a jury, at the close of plain-tiff's testimony on defendants' motion, the trial court directed a verdict in favor of the defendants, and this writ of error is brought from the judg-ment entered thereon.

The essential facts in evidence are stated in the opinion.

Harry Rubens, Gustave F. Fischer, Edwin J. Mosser, and William C. Rigby, for plaintiff in error.

Oliver H. Horton, Frederick H. Wickett, John H. Miller, and George J. Meier, for defendants in error.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

SEAMAN, Circuit Judge. The verdict in favor of the defendants was directed by the court, without other testimony than that offered by the plaintiff, and no errors are assigned for other rulings in the course of the trial. Thus the sole question raised by the writ of error is whether sufficient facts were presented for submission of an issue of fact under the pleadings to the jury. The evidence is in writing—chiefly in correspondence between the plaintiff and the defendants or their conceded representatives—except one personal interview between the plaintiff and defendants' representative in the transactions.

Plaintiff resided at La Crosse, Wis., and appears to have had trans-actions with the defendants, Chicago brokers, in purchases of various stocks prior to those in controversy. The issues in suit, however, arise out of a purchase (ordered by the plaintiff) of 900 shares of Empire Consolidated Quicksilver Mining Company stock [hereinafter called for brevity Empire stock], at $10 per share, for which the plaintiff ultimately paid to the defendants the purchase price and all charges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

For some time prior to the transaction, the issues of stock of this New Jersey corporation were represented only by temporary certificates of shares, pending arrangement for issuance of the regular corporate certificates, to replace such preliminary issue in the hands of holders when prepared. These instruments were entitled "temporary receipt for stock subscription," certified the person named to be the owner of the number of full paid shares stated and that "a certificate will be issued therefor when" engraved and ready for delivery, on presentation of the "receipt." It was dated and purported to be signed by the president and attested by the secretary. The plaintiff was the holder of certificates in this temporary form, under his previous transactions with defendants for Empire shares, at the date of his first order in controversy, December 1, 1901, and during several days thereafter, and was well advised of their nature and terms. The 900 shares obtained and carried by the defendants, in alleged compliance with the plaintiff's order and payment, were represented only by such temporary certificates; but the plaintiff was not expressly advised of such nature until long after his payment was completed and when the shares were demanded. These temporary certificates bore date as issued by the corporation December 10, 1901, while it appears in evidence that regular certificates of shares had been theretofore provided and issued by the corporation, executed in the prescribed form, with signature of the president and treasurer, and countersigned by a "registrar" and a "transfer agent"; and one of these instruments (in evidence as a sample) bears date December 7, 1901.

[1] Thus the issue is presented—either of law alone, or of law and fact—whether the temporary certificates so purchased, held and tendered by the defendants, were within the meaning of the contract entered into between the parties; and, except for the above-mentioned state of facts, we believe its solution would be free from difficulty, as a question of general law, applicable to purchases of stock in the relation of customer and broker. Under the general rule, the customer's order for shares of Empire stock would imply certificates of ownership, authenticated pursuant to the corporate charter and so marketed. The corporation act of New Jersey (P. L. 1896, p. 277), under which this corporation was organized, provides, in section 19:

"Every stockholder shall have a certificate signed by the president and treasurer, certifying the number of shares owned by him in such corporation."

No other provision is brought to our attention as applicable to the case, and the above-described "temporary receipt for stock subscription" is plainly not the certificate required by this provision. It neither purports to be a valid certificate of corporate shares, nor has the authentication provided therefor to confer the rights of stockholder in the corporation. The contention, therefore, on behalf of the defendants, that it is of equal value for the purposes of the investor— if assumed to be true—is without force under an issue of performance within the general rule above stated. In such case the doctrine is elementary that the purchaser is entitled to the exact fulfillment of his order. Norrington v. Wright, 115 U. S. 188, 203, 6 Sup. Ct. 12, 29

L. Ed. 366; Meyer v. Richards, 163 U. S. 385, 395, 405, 16 Sup. Ct. 1148, 41 L. Ed. 199; Hesser v. C. & W. Coal Co., 151 Fed. 211, 213, 80 C. C. A. 263; Benjamin on Sales (6th Ed.) §§ 600, 606; Kinser v. Cowie, 235 Ill. 383, 85 N. E. 623, 126 Am. St. Rep. 221.

[2] We believe, however, that the evidence referred to creates an exception of the present contract from the rule that authenticated certificates of stock were intended and required by the plaintiff's order. The order and purchase thereunder appear from the following correspondence between the parties; but their understanding of the term "Empire shares" must be ascertained from the circumstances then known and recognized by both parties in reference to their previous transactions in the temporary receipts.

The contract arose through letters interchanged—primarily between the plaintiff and one Simmons, who was a clerk at the time thereof in the office of the defendants—as follows: On December 1, 1901, the plaintiff's letter to Simmons mentions acceptance of a purchase made upon his order of 200 shares of Empire stock, desire to sell other stocks on hand in other corporations, and says he would "take on about 900 shares more" of Empire if obtained at $10 per share. Simmons answered December 2d that he had "taken steps to try to reserve the 900 shares for you under my option" (theretofore secured by him) and would advise further. On December 5th Simmons writes again that the "option on Empire will expire on Saturday"; that he had wired New York "to ship the 900 shares to me in my name" which the plaintiff could have if he so wired, on forwarding the other stocks referred to for sale. In a postscript to this letter Simmons says:

"I have quite a lot of Empire to exchange for engraved certificates, which I will send to our Mr. Nicolay in New York very shortly and have them exchanged. If you so desire, send me your holdings and I will include them with mine and my clients'."

Later, on the same day, Simmons writes that his order for the 900 shares "puts no obligation" on him, and, if the plaintiff concludes not to take them, they can be returned or sold to others. On December 6th the plaintiff acknowledges "favor of the 5th inst." and says: "I presume you have gotten at $10 per share." And mentions other stocks as sent for sale. He then adds: "I have already forwarded my temp. certificates to New York for exchange for regular Cert."

On December 7th the plaintiff writes Simmons, in answer to the later letter of the 5th, that markets "look rather bad, and if you can hold off for a few days on the last Empire, wish you would do so"; also, that "Empire may not be listed as soon as expected, but certainly have great faith in the stock and look for higher prices when things become more settled." Simmons answers December 9th, mentioning other sales made as ordered and the proceeds "are now to your credit with Logan & Bryan"; and that "I am prepared to deliver the 900 shares Empire, to them for your account on receipt of directions from you." In letter of December 10th, plaintiff writes: "I will take the 900 shares of Empire at $10 per share as formerly agreed and am very much obliged to you for holding off a few days." In the foregoing correspondence no direct participation appears by the members of the

firm of Logan & Bryan (defendants); but the letters of Simmons bear the letterhead of that firm.

On December 12th Logan & Bryan advised the plaintiff: "We to-day paid $9,000 for 900 shares of Empire Quicksilver and charged the same to your account as per your instructions to Mr. Simmons." It then mentions impairment of the account of Gund & Co. and says: "We presume it is your intention that the funds in your personal account shall extend to the Gund & Co. account in case of need but if this is not your desire, kindly notify us and at the same time send us check on the Gund & Co. account." On the same day Simmons advised Gund, "I have to-day delivered to Logan & Bryan your 900 shares Empire, which have been placed in your account."

The evidence, therefore (all introduced by the plaintiff), discloses the undisputed fact that on December 1st, when the plaintiff proposed to "take on about 900 shares more of the Empire" stock, he was the holder of temporary receipts only (under his previous purchases from the defendants); and proof does not appear prior to the letters of December 5th that either party was advised of preparation on the part of the corporation to issue its certificates of stock. It is true that the plaintiff introduced a letter of advice thereof, purporting to be addressed to him from the corporation, dated November 29th; but proof is wanting, both of the date of its receipt by plaintiff and of the defendants' information thereof prior to December 5th. Meantime, Simmons' letter of December 2d notified the plaintiff that he held an option on Empire shares and had "to-day taken steps to" reserve "the 900 shares for you"; and the "shares" so obtained are identified as the purchase in controversy. Neither of the letters intimates expectation or purpose to discriminate between these known forms of certificates, and, in the absence of such proof, no departure appears from the plaintiff's order. The burden rests on the plaintiff to prove his charge of nonperformance of the contract, and we believe the evidence furnishes no ground for such charge. Indeed, no proof is offered tending to show that regular certificates were issued prior to December 7, 1901. Whatever may have been the information of either party on or prior to December 5th, as to readiness of the corporation to issue regular certificates, on presentation of temporary receipts of the outstanding issue, the order December 1st and purchase December 2d were placed under their mutual understanding, not only that the temporary issue was on the market as "Empire stock," but was so held by each of them; and without express direction otherwise—to say the least, after Simmons' letter of December 2d—it must be inferred therefrom that the general terms of the order, either called for the outstanding temporary issue, or left it open to purchase, whichever form of certificate was offered in the market. The contract was closed December 12th, pursuant to this understanding as we believe, and the subsequent conduct of both parties is entirely consistent therewith, throughout the period (of a year and over) during which the certificates were held for the plaintiff; and the present controversy arose after Empire stock had greatly depreciated in value and the corporation was placed under receivership, with no intimation of complicity, deception, or misconduct otherwise on the part of the defendants.

One item of testimony remains for mention: The plaintiff states that on December 18 or 19, 1901, he visited the office of defendants and had a conversation with Mr. Simmons, in the course of which mention was made that plaintiff had sent in his Empire receipts for exchange for "regular stock," and Simmons remarked, that Logan & Bryan's "were all sent for the exchange." This conversation forms no part of the pre-existing contract in suit, and, if admissible in any sense by way of interpretation, we believe it has no bearing in favor of the contention that such receipts were not within the meaning of the original contract; and neither neglect nor injury is charged in respect of the custody or care for the stock pending delivery.

We are of opinion, therefore, that direction of verdict for the defendants was not erroneous, and the judgment, accordingly, is affirmed

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes